UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT ALLEN LANGE,                    )
                                       )
        Plaintiff,                     )        No. 11 C 2958
                                       )
    v.                                 )        Magistrate Judge Schenkier
                                       )
MICHAEL J. ASTRUE, Commissioner,       )
                                       )
                                       )
        Defendant.                     )
                                       )

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, Scott A. Lange, pursuant to 42 U.S.C. § 405(g), seeks

review of the final decision by the Commissioner of Social Security ("Commissioner") denying his

application for social security benefits. Mr. Lange has filed a motion seeking reversal and/or remand

of the decision (doc. # 19). The Commissioner, in turn, has filed a motion seeking summary

affirmance of that same decision (doc. # 24). For the reasons set forth below, the Court grants the

Commissioner's motion, and denies Mr. Lange's motion.

## I.

We begin with the procedural history of this case. On December 8, 2006, Mr. Lange applied

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging he

became unable to work on the onset date of December 1, 2004 (R. 157-61, 164-66). He alleged

disability based on the following impairments: back injury, four slipped discs, spine compression

fracture and arthritis in the spine, carpal tunnel syndrome ("CTS"), back pain that radiates down hips

---

[1]On January 13, 2012, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was
referred to this Court for all further proceedings, including the entry of final judgment (doc. # 16).

and legs, prominent disc bulging at L5-S1, mild disc bulging at L2-L5, and L3-L4 central protrusion effacing the thecal sac (R. 189). After his disability applications were denied initially and upon reconsideration, Mr. Lange sought and received a hearing before an administrative law judge ("ALJ"), which took place on July 9, 2009 (R. 33). On September 25, 2009, the ALJ issued a written decision denying benefits and finding Mr. Lange not disabled under the Social Security Act ("the Act") (R. 13-27). The Appeals Council denied review on March 28, 2011 (R. 1), making the ALJ's decision the Commissioner's final decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## II.

We first summarize the administrative record. We set forth the general background in Part A, followed by the medical record in Part B. In Part C, we discuss the hearing testimony, and we address the ALJ's written opinion in Part D.

## A.

Mr. Lange was born on June 9, 1972 (R. 39). He has a tenth grade education and speaks English fluently. He lives with his wife and son (R. 39-40). For approximately twelve years Mr. Lange worked as a self-employed floor installer, installing hardwood, maple, and oak flooring, ceramic tile, and carpeting (R. 44-46). Depending on the type of flooring being installed, Mr. Lange was required to lift an approximately 240-pound piece of machinery twice a day, sixty-pound flooring bundles multiple times a day, and lighter tools throughout the workday (*Id.*).

## B.

Since the alleged onset date of his disability, Mr. Lange has been evaluated and treated by multiple physicians. A chiropractor, Dr. Gareth Trichardt, treated Mr. Lange periodically from January 2005 until July 2006, but Mr. Lange continued to have pain in his back, hips, and legs

(R. 192).[2] Dr. Trichardt reported that a June 2006 MRI of Mr. Lange's lumbar spine revealed disk

bulging and degenerative changes at multiple levels from L2 to L5, with minimal narrowing of the

spinal foramen and a compression fracture or disk protrusion at L5 (R. 243).

Mr. Lange was next examined by neurologist Rodrigo Ubilluz in July 2006 (R. 446). Mr.

Lange reported constant pain in his right lower back, buttock, upper lumbar region, and leg – all the

way down to his right foot (*Id.*). On examination, Dr. Ubilluz noted Mr. Lange had a positive (which

means a painful) straight leg raise with some loss of sensation (*Id.*). Dr. Ubilluz prescribed muscle

relaxants, steroids, and other medications (*Id.*). In August and September 2006, Mr. Lange's lower

back pain was much improved, and he reported walking more (R. 443-44). He only had pain in his

right leg if he stood for a prolonged period of time (*Id.*). By August 2006, Dr. Ubilluz noted that Mr.

Lange's straight leg raise was negative and he did not have trigger points in his lower back (*Id.*).

In September 2006, Mr. Lange also began seeing neurosurgeon Thomas Hurley. On

September 28, 2006, Mr. Lange described his back pain as constant and sharp, with occasional pain

in the back of his leg, especially in the right thigh (R. 465). His pain worsened when walking or

bending over (*Id.*). On examination, Mr. Lange had a positive straight leg raise and 5/5 strength in

his lower extremities (R. 465-66). Dr. Hurley diagnosed Mr. Lange with chronic lower back pain

and degenerative disk disease at L2-L3 to L5-S1 (R. 466). Dr. Hurley prescribed several different

pain medications and suggested epidural steroid injections (*Id.*).

In October 2006, Mr. Lange began receiving physical therapy (R. 193). During his first visit

on October 17, 2006, Mr. Lange reported constant lower back pain, decreased flexibility in his hips,

---

[2]A graduate of a chiropractic school receives the degree of "Doctor of Chiropractic," and in the United States is entitled to use the title "doctor." *See Johnson v. Astrue*, No. 11 C 3989, 2012 WL 3205039, at *2 n.2 (N.D. Ill. Aug. 2, 2012).

and limited tolerance for walking or standing (R. 318). The physical therapist prescribed ice/heat, electrical stimulation, massage, strengthening, and stretching (*Id.*).

Mr. Lange next visited Dr. Hurley on November 15, 2006 (R. 464). Mr. Lange reported that his pain had improved somewhat, but he still had back and leg pain (*Id.*). Dr. Hurley reviewed an MRI that showed evidence of degenerative disk disease changes from L2-L3 down to L5-S1, which showed disk base collapse and bilateral neuroforaminal stenosis (narrowing) (*Id.*). On examination, Mr. Lange's strength was 5/5 throughout his lower extremities but he had a positive straight leg raise bilaterally (*Id.*). Dr. Hurley recommended Mr. Lange continue physical therapy (*Id.*).

In December 2006, after fourteen physical therapy sessions, the physical therapist noted that Mr. Lange's symptoms had changed, with pain radiating into his leg, calf, and toes, and increased pain with walking and standing and trouble sleeping (R. 317). On December 15, 2006, Mr. Lange told Dr. Hurley that physical therapy made his back pain worse, and he had lower extremity pain traveling to his thigh, but his right hip pain was somewhat improved (R. 463). Mr. Lange obtained an MRI of his lumbar spine, which revealed multiple degenerative disks, but no herniation (R. 462-63). On December 21, 2006, Dr. Hurley noted that he was not sure why Mr. Lange had lower back and leg pain (R. 462).

In February 2007, Mr. Lange visited Dr. Ubilluz and reported increased pain in his hips and lower back, and in his right foot, leg, hamstring, calf, testicle, and groin (R. 442). He also reported numbness in both hands, but testing was negative for CTS (*Id.*). Mr. Lange stated that he "got three shots" the previous month, which helped him sleep (*Id.*). Dr. Ubilluz noted slightly decreased sensation in his upper right arm and positive right straight leg test (*Id.*). An EMG revealed evidence of right S1 radiculopathy and radiation into Mr. Lange's right leg (*Id.*).

4

A March 2007 MRI showed disk protrusion and mild herniation, degeneration, and bulge (R. 248). Dr. Ubilluz diagnosed right S1 radiculopathy and degenerative joint disease (R. 439). Dr. Hurley, however, "was reluctant to consider surgery because of the multiple degenerated discs" (R. 460). Mr. Lange's symptoms were worse at his next visit to Dr. Ubilluz in April 2007: he could not turn his head to the right, he had lower back pain with spasms and radiation into both legs, and he had pain in his right and left elbows and hands (R. 438). Mr. Lange had positive right leg raise and an antalgic (abnormal, pain avoiding) gait, but 4/5 strength in both legs (*Id.*).

On April 7, 2007, Dr. Afiz Taiwo evaluated Mr. Lange at the request of the state Disability Determination Services ("DDS"). Mr. Lange told Dr. Taiwo that he had constant lower and mid-back pain that radiated down to his right leg, and was aggravated with bending, standing, walking, mopping, and sweeping; he could walk a quarter of a block, stand for fifteen minutes, and sit for an hour (R. 330-31). Mr. Lange also stated that he had CTS with left wrist pain and numbness in his fingers (*Id.*). On examination, Dr. Taiwo reported that Mr. Lange could get on and off the examining table without difficulty and walk more than fifty feet with a non-antalgic gait (R. 332). He had irritation in his left wrist nerves, but could grasp and manipulate objects normally (*Id.*). His reflexes and sensory exam were satisfactory, but his straight leg raise test was positive on the right side (*Id.*). Dr. Taiwo concluded that Mr. Lange suffered from left CTS, lumbar radiculopathy, and degenerative disk disease of the lumbar spine (R. 333).

On April 20, 2007, medical consultant Dr. Delano Zimmerman completed a Residual Functional Capacity ("RFC") Assessment based on Mr. Lange's medical records (R. 334-41). He described Mr. Lange's primary diagnoses as degenerative disk disease and left CTS (R. 334). Dr. Zimmerman found that Mr. Lange had no manipulative limitations and unlimited range of motion

of his hips, knees, ankles, cervical spine, shoulders, elbows, and wrists (R. 337, 341). He opined that Mr. Lange could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and/or pull for an unlimited amount of time (*Id.*). Dr. Zimmerman determined that Mr. Lange was capable of occasionally climbing ramps, stairs, ladders, ropes, or scaffolding, balancing, stooping, kneeling, crouching, and crawling (R. 336).

In May 2007, Dr. Ubilluz wrote two notes (the intended recipients were not identified) (R. 436-37). The first note, dated May 2, 2007, stated that Mr. Lange suffered from right S1 radiculopathy, and he was unable to tolerate the duties at his present job (R. 437). Mr. Lange did not think he could return to work under the present circumstances, and Dr. Ubilluz concluded that: "[a]t the present time, [Mr. Lange] is disabled to work," and "[i]t is unknown to [him] how long [Mr. Lange] will be unable to go back to work, it may be 3 or months or more" (*Id.*).

Three weeks later, on May 23, 2007, Dr. Ubilluz authored a second, almost identical, note (R. 436). The second letter differed from the first in that it stated that Mr. Lange "is unable to return to any kind of physical work for one year or more" (*Id.*). On that same day, Dr. Ubilluz reported in a separate note that "[t]he patient is asking for me to re-write the previous letter" (R. 435). On examination, Mr. Lange had right leg weakness with pain in the back of both legs when raised, but Dr. Ubilluz did not attribute this pain to the herniations in Mr. Lange's thoracic spine (*Id.*).

That month, Mr. Lange also began treatment with Dr. Bush, a pain management specialist (R. 538). Mr. Lange explained that his right hip pain began as episodic two years ago, but became constant and sharp, radiating down to his thigh and calf (*Id.*). His pain was worse with prolonged standing, walking, bending, or twisting, but improved with bed rest, heat, and occasionally with

medication (*Id.*). On examination, Dr. Bush found Mr. Lange had full range of motion of his thoracic spine, tenderness in the lumbar spine with muscle spasm, limited flexion and extension, and normal rotation and side bending (R. 540). His gait was antalgic favoring the right, straight leg raise was positive bilaterally, and motor strength was 5/5 (*Id.*). Dr. Bush noted that Mr. Lange sat comfortably in a chair without acute distress (*Id.*). He recommended medication and epidural injections (R. 541). After his first epidural injections in May and June 2007, Mr. Lange told Dr. Bush that he no longer experienced right lower extremity pain (R. 531-32). His lower and mid-back pain was unchanged, however, and worsened with work, lifting, prolonged standing, walking, bending, and twisting (*Id.*). On examination, Mr. Lange had no facet joint tenderness in the lumbar spine, negative straight leg raise, and lumbar flexion and extension were improved but limited (*Id.*).

Mr. Lange next visited Dr. Ubilluz in June 2007 (R. 434). Mr. Lange reported that despite receiving two epidural shots and taking Vicodin, he had pain from his neck to his legs (*Id.*). His examination showed right leg weakness, with pain in both his legs and lower back when his legs were raised (*Id.*). Dr. Ubilluz wrote that he did "not have much to offer [Mr. Lange] at this point in time" (*Id.*). On June 27, 2007, he filled out a form for DDS diagnosing Mr. Lange with mild chronic compression, radiculopathy, herniation, and compression fracture at L5 (R. 350-51). Dr. Ubilluz noted that Mr. Lange had pain in his lower back, numbness in both legs, and weakness in his right leg, yet no atrophy and no assistive device was needed for ambulation (R. 350). Mr. Lange was treated with medication and epidural injections, with minimal response to treatment (R. 351). Dr. Ubilluz concluded that Mr. Lange could stand or walk for ten minutes at most and could sit for twenty to thirty minute stretches before needing to change positions (*Id.*).

Mr. Lange last saw Dr. Ubilluz in August 2007 (R. 433). Dr. Ubilluz reviewed a July 2007 MRI, which revealed that Mr. Lange had disk protrusion at C3-4 and broad based disk bulge with mild narrowing at C6-7 (*Id.*). Mr. Lange reported taking two Vicodin three times a day for pain in his back, legs, neck, and arms (*Id.*). Dr. Ubilluz's medical examination revealed no changes (*Id.*).

Mr. Lange visited Dr. Bush regularly through June 2009, during which time his pain waxed and waned (R. 544). After the third epidural steroid injection on July 2, 2007 (R. 529), Mr. Lange reported to Dr. Bush that he was completely free of lower extremity pain (R. 527). His lower back pain remained unchanged, yet improved with rest and medication (*Id.*). On examination, his gait was non-antalgic, he did not have muscle spasms, and straight leg raise was negative bilaterally (R. 527-28). A fourth injection July 30, 2007 (R. 525), however, did not significantly improve his pain (R. 523). On an August 10, 2007 visit to Dr. Bush, Mr. Lange reported constant pain in his back, with some pain in his thigh, and pain in his upper hand due to CTS (*Id.*). His pain was only somewhat improved with medication (*Id.*).

In September 2007, Mr. Lange reported to Dr. Bush that the pain in his lower back, buttock, and leg had decreased since his last visit, but he continued to experience constant diffuse pain in his neck, thorax, and lower back, which was worse with movement and better with medication (R. 509). Mr. Lange also experienced episodic right lower extremity pain with prolonged standing, walking, or activity, and continued episodic upper extremity numbness and pain, but he denied hand weakness (*Id.*). On examination, his gait was normal but he was tender with limited range of motion (*Id.*). On September 24, 2007, Mr. Lange received intra-articular thoracic facet injections (R. 492). On October 5, 2007, he told Dr. Bush that the injections had improved his back and cervical pain, but

8

he continued to have pain in his lower back, buttock, and leg (R 505). Mr. Lange also reported a mild return of pain in his thigh and calf with standing and walking (*Id.*).

In October 2007, Mr. Lange briefly returned to physical therapy (R. 367-73). At his initial evaluation on October 9, 2007, Mr. Lange reported back pain, trouble walking and decreased strength (R. 367). On October 29, 2007, after six sessions, his physical therapist reported that Mr. Lange showed no significant improvement, and his pain had gotten worse following physical therapy (R. 368). The therapist discharged Mr. Lange, noting "goals not met, patient doesn't appear to benefit from [physical therapy] now" (*Id.*).

On November 2, 2007, Mr. Lange reported to Dr. Bush that the pain in his lower back, buttock, and leg, had increased more than 20 percent after receiving an additional thoracic facet joint injection on October 8, 2007 (R. 502). In late November 2007, Mr. Lange told Dr. Bush that his lower extremity pain had increased and was worsened with standing and walking, but improved with rest and lying down (R. 499). He also noted continued difficulty with CTS (*Id.*). On November 28, 2007, Dr. Bush noted Mr. Lange's work status was "temporarily disabled" (*Id.*).

In December 2007 and January 2008, Mr. Lange's lower back, buttock, and leg pain increased and decreased, but his gait, station, and posture remained normal (R. 494-95, 497, 500). Mr. Lange reported relief with his medications, but Dr. Bush noted that Mr. Lange's urine drug screen was inconsistent with his prescribed medications (R. 494, 497, 499).

Following an epidural injection on February 2, 2008, Mr. Lange reported to Dr. Bush decreased pain in his lower back, buttock, and leg (R. 489). However, he had a constant, localized ache in his mid back, which was aggravated with activity and prolonged sitting, but did not radiate

9

to his upper extremities (R. 486). Dr. Bush recommended Mr. Lange continue his current medication, and he ordered thoracic facet injections for Mr. Lange's mid back pain (R. 487).

In April and May 2008, Mr. Lange reported increased pain in his lower back, buttock, and leg, despite receiving additional epidural injections, and he had constant diffuse body pain in his upper and lower back with episodic radiation into his right lower extremity (R. 416, 418). On May 23, 2008, Dr. Bush reported that Mr. Lange's pain was reduced with an increased dosage of his medications (R. 415). A thoracic facet joint injection on June 16, 2008, decreased Mr. Lange's back and upper extremity pain in late June 2008 (R. 412).

On July 17, 2008, Mr. Lange reported that his pain had not changed (R. 408). In Dr. Bush's notes from that visit, and in notes through his last visit with Mr. Lange in the record on June 5, 2009, Dr. Bush included the statement that "[t]he patient is disabled." (*Id.*).

Mr. Lange received two more epidural injections in August 2008 (R. 405, 517-18). On August 20, 2008, he reported that his mid/upper back and shoulder pain decreased (R. 405). His back pain stayed the same in September and October 2008 (R. 402), but increased in November 2008 (R. 396). In January and February 2009, Mr. Lange complained of a 10 percent increase in pain (R. 387, 390), but in March 2009, Mr. Lange reported approximately 30-40 percent improvement in back pain following an epidural steroid injection on February 18, 2009 (R. 519, 558).

Following an epidural injection on March 23, 2009 (R. 520), Mr. Lange reported decreased lower back, buttock, and leg pain (R. 555). After an April 22, 2009 epidural injection (R. 521), however, Mr. Lange reported increased pain in his neck, upper back, lower back, buttock, and leg, that worsened with any type of movement, including sitting and standing (R. 552). On exam, Mr.

Lange's gait was antalgic, he was using a cane, and he had positive right straight leg raise, but his muscle strength was 5/5 and sensory response was normal (R. 553).

In May 2009, Mr. Lange reported decreased pain in his lower back, buttock, and leg, but his neck and mid back pain remained the same (R. 548). An April 2009 MRI study of Mr. Lange's lumbar spine (R. 561) did not appear significantly changed from the December 2006 MRI study, except for slightly increased degenerative end plate changes and bilateral neural foraminal narrowing at L5-S1 (R. 548). Mr. Lange received another epidural steroid injection on May 18, 2009, and on June 5, 2009, he reported decreased pain in his lower back, buttock, and leg (R. 544). His upper and mid back pain and upper extremity pain remained the same (*Id.*). On examination, Mr. Lange's gait was antalgic, he sat with his weight on the left side, his posture was normal, straight leg raise elicited pain on the right, and his right leg strength was 5/5 (R. 545).

### C.

A hearing was held before ALJ Mona Ahmed on July 9, 2009 (R. 33). Mr. Lange and Vocational Expert ("VE") Lee Knutson testified at the hearing (R. 34).

Mr. Lange testified that he has constant back and neck pain (R. 49). His lower back caused him the worst pain, which radiated into his buttock, right leg, calf, ankle, and foot (*Id.*), and which was exacerbated by standing or walking for long periods (R. 52). He stated that he could stand for five to seven minutes before the pain was so severe that he had to lie down for approximately one hour (R. 53). Mr. Lange also had pain in his lower back, buttock, and leg when sitting (R. 53-54). He testified that he had been using a cane for the past six months, and the farthest he has walked in several months was from the parking lot to the ALJ's hearing room (R. 56). He stated that he cannot kneel and that the heaviest he can lift is a gallon of milk with two hands (R. 56-57, 60).

11

Mr. Lange testified that his doctors do not recommend surgery to ease his back pain because there are "too many levels of damage" in his back (R. 50-51). Mr. Lange stated that he has had at least twelve epidural injections since 2007 (R. 51), but they only occasionally help reduce his pain (R. 66). He takes medication to help deal with the pain, but it makes him dizzy, drowsy, and fatigued (R. 63). Mr. Lange stated that Dr. Bush recommended surgery to address his CTS but he was having trouble finding a surgeon who would take Medicaid (R. 65-66).

Mr. Lange tends to his own personal hygiene, including showering, shaving, and dressing (R. 67, 70-71). However, he stated that both shaving and showering are painful (R. 67). Because of his pain, his wife and son do all of the household chores: he does not clean, cook, wash dishes, vacuum, or mow the lawn (R. 69). During the night he is frequently awakened by pain, and therefore only sleeps about two hour stretches at a time (R. 58). Mr. Lange testified that he only leaves his house to go to doctor appointments (R. 59), and that rain and cold weather makes his pain worse (R. 61).

When questioned about Dr. Bush's notes stating that several of his urine drug screens were inconsistent with his prescribed medications, Mr. Lange testified that Dr. Bush had not discussed the issue with him, and he did not know why the tests would be inconsistent (R. 74). Mr. Lange denied asking Dr. Ubilluz to write him a second letter in support of his disability claim (R. 74-75).

The VE began his testimony by classifying Mr. Lange's past relevant work as a floor installer and contractor (R. 77). He testified that while the Department of Labor classifies Mr. Lange's former occupations as involving either a "medium" or "light" level of exertion, Mr. Lange had performed all past relevant work at a "heavy" and skilled level (*Id.*).

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work experience as Mr. Lange, who could do sedentary work, could lift a maximum of ten

pounds "with occasional lifting of smaller items like files or small tools," stand and walk for short periods of time totaling a maximum of two hours in an eight-hour workday, and sit for six hours with a sit/stand option allowing him to alternate positions every thirty-minutes (R. 78). The individual could not climb ladders, ropes, or scaffold, or kneel, crouch, crawl, or work with heights or hazards, and stooping and climbing ramps and stairs could only be done occasionally (*Id.*). The VE testified that this hypothetical person could work as a bench assembler, for which there are approximately 2,300 jobs in the regional economy; an order clerk, for which there are approximately 2,900 jobs in the regional economy; or a surveillance system monitor, for which there approximately 2,200 jobs in the regional economy (R. 78-79).

The ALJ then asked about a hypothetical individual who could only stoop and climb ramps and stairs "very little" (R. 79). The VE responded that the additional restriction did not change her answer because sedentary jobs do not require a lot of stooping or climbing (*Id.*). However, if the hypothetical individual could never stoop, then jobs the listed would be unavailable (*Id.*).

The ALJ then added the restriction that the hypothetical individual would need a cane to walk. The VE concluded that this would not prevent the individual from being an order clerk or surveillance monitor, but an assembly job that required standing occasionally would be precluded (R. 79-81). The ALJ then asked how job availability would be affected if the individual could frequently, but not constantly, handle objects with his non-dominant hand (R. 86). The VE stated that assembly jobs would be reduced by half, while the other positions would not be affected (R. 86-87). However, if the individual could only use his non-dominant hand occasionally, then no assembly jobs would be available to him, as such jobs require frequent use of both hands (R. 87).

13

The VE testified that likely no jobs would be available if the hypothetical individual had to lie down for an hour a day (R. 81-82). For unskilled jobs, an individual who was off task for more than 15 percent of the day would be unable to do any of the jobs he described (R. 82). Mr. Lange's attorney asked the VE whether he was assuming that the individual could concentrate throughout the workday (*Id.*). The VE responded that the sedentary work he described would require the individual to be on task for 85-90 percent of the workday (R. 82-83). If an individual needed to stand every fifteen minutes, the VE opined that such an individual could work as a surveillance system monitor or an order clerk, but probably not as an assembler (R. 84).

### D.

The ALJ issued a written decision on September 25, 2009, denying benefits and finding Mr. Lange not disabled under the Act (R. 13-27). At Step 1, the ALJ found that Mr. Lange's last insured date was December 31, 2008, and that Mr. Lange had not engaged in substantial gainful activity since his alleged disability onset date of December 1, 2004 (R. 15). At Step 2, the ALJ found that Mr. Lange's degenerative disk disease constituted a severe impairment (*Id.*).

At Step 3, the ALJ concluded that Mr. Lange's impairments did not meet or medically equal a listed impairment (R. 15). The ALJ found that Listing 1.04(C) was not met "because there is no evidence of pseudoclaudication" (painful leg cramps caused by spinal, neurologic, or orthopedic disorders), the medical record rarely documented weakness, and Mr. Lange was able to ambulate effectively (R. 16). The ALJ held that Listing 1.04(A) was not met, as no single examination documented all the requisite clinical findings of "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss [atrophy and/or associated muscle weakness] accompanied by sensory or reflex loss" and "positive straight-leg raising test (sitting and supine)" (*Id.*).

14

The ALJ then determined that Mr. Lange had the RFC to perform sedentary work as defined in 20 C.F.R §§ 404.1567(a) and 416.967(a) (R. 16). She concluded that Mr. Lange could lift a maximum of ten pounds, occasionally lift items like files and tools, stand or walk for short periods totaling two hours in an eight-hour workday, and sit for at least six-hours with a sit/stand option allowing Mr. Lange to alternate positions every thirty minutes (R. 16-17). Mr. Lange could not climb ladders, ropes, or scaffolds; kneel, crouch or crawl; or work at heights or around hazards; and he could do "very little" stooping and climbing of ramps or stairs (R. 17).

In making this determination, the ALJ found that although Mr. Lange's "medically determinable impairment could reasonably be expected to cause the alleged symptoms . . . [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible given a number of inconsistencies in the record" (R. 17-18). Specifically, the ALJ noted that diagnostic studies showed mostly "mild" disk abnormalities, with at most "moderate" spinal stenosis (R. 21). Moreover, in clinical examinations, abnormalities were inconsistently shown and often unremarkable (*Id.*). In addition, the ALJ noted that on examination Mr. Lange's gait was more frequently normal than antalgic, and Dr. Ubilluz opined that he did not need an assistive device (*Id.*). The ALJ concluded that Mr. Lange's use of a cane was not medically necessary (*Id.*).

The ALJ noted several additional inconsistencies in the record that detracted from Mr. Lange's credibility (R. 22-25). *First*, several of Mr. Lange's urine tests were inconsistent with his prescribed medications, which suggested that Mr. Lange was failing to take these medications as prescribed (R. 22). *Second*, while Mr. Lange testified to significant side effects from his medications, "Dr. Bush's progress notes consistently documented no excessive sedation from medications" (*Id.*). *Third*, while Mr. Lange reported not working since December 1, 2004, the record

15

referred to him working as an independent contractor after that date (*Id.*). *Fourth*, at the hearing, Mr. Lange denied asking Dr. Ubilluz to change the letter he had written in support of Mr. Lange's disability claim, but "the doctor's note clearly indicated the claimant requested the change," and the ALJ found this "detracts substantially from [Mr. Lange's] credibility" (*Id.*). *Fifth*, while "[h]e alleged that pain detracts from concentration," Mr. Lange attended "the hearing [which lasted for one hour and fifteen minutes] and answered questions appropriately" (*Id.*).

The ALJ also considered the nature and frequency of Mr. Lange's medical treatment and his use of medications (R. 22). The ALJ noted that Mr. Lange "had only conservative care for his back problem," and his pain treatment in 2004 and 2005 was limited to chiropractic care (*Id.*). He began more extensive treatment in 2006, but the ALJ noted that Mr. Lange had not pursued all treatment options available, such as spinal cord stimulation (*Id.*). The ALJ stated that Dr. Bush's progress notes indicated that the epidural injections were "fairly effective," suggesting that they "provide sufficient relief that [Mr. Lange] could do sedentary work with a sit/stand option" (*Id.*). Moreover, the ALJ commented that by Mr. Lange's own account, "medications and injections continued to improve pain as documented from May 2007 to August 2007 as well as in December 2007, February 2008, May 2008, June 2008, March 2009, and March 2009" (*Id.*).

While the ALJ acknowledged that Mr. Lange's daily activities were limited due to his alleged pain, the ALJ noted that the two state medical consultants concluded that Mr. Lange "could lift 20 pounds occasionally and 10 pounds frequently, stand/walk about six hours, sit about six hours, and perform all postural activities occasionally" (R. 23). Furthermore, the medical consultants observed that "[w]hile [Mr. Lange's] straight leg raise was positive; [his] strength was 5/5; he could get on/off the exam table with no difficulty; could walk 50 feet without support, with a non-antalgic gait and

16

no assistive devices; he had 5/5 grip strength in both hands; and normal ability to grasp and manipulate objects" (*Id.*). The ALJ held that the consultants' opinions were both reasonable and supported, and therefore "are given some weight" (*Id.*).

However, the ALJ found that Dr. Ubilluz's opinion, combined with Mr. Lange's allegations of pain, showed that Mr. Lange's RFC required greater limitations than those suggested by the two state medical consultants (R. 23). Dr. Ubilluz had opined that Mr. Lange could stand or walk for ten minutes, and needed to change positions every twenty to thirty minutes (*Id.*). The ALJ concluded that Dr. Ubilluz's recommendations were consistent with the assessed RFC (*Id.*).

The ALJ did not find persuasive the two additional notes written by Dr. Ubilluz that described Mr. Lange as "disabled," because they were "not very revealing in terms of specific, functional abilities and limitations" (R. 24). In the first note, dated May 2, 2007, Dr. Ubilluz wrote that Mr. Lange was "unable to go back to work" for three months, suggesting to the ALJ that his condition was temporary and he could possibly perform work other than as a floor installer (*Id.*). On May 23, 2007, Dr. Ubilluz wrote that Mr. Lange was "unable to return to any kind of physical work for one year or more;" that same day, Dr. Ubilluz wrote another note stating that "the patient is asking for me to re-write the previous letter I made for him" (*Id.*). The ALJ concluded that Dr. Ubilluz may have written a new note at Mr. Lange's request, "despite his own concern that the objective findings did not support [Mr. Lange's] symptoms" (*Id.*). Moreover, the second note referred to Mr. Lange's inability to do "physical work," and the ALJ did not think sedentary work is "physical in the ordinary sense of the word" (R. 24-25).

The ALJ also considered Dr. Bush's progress notes in which she occasionally referred to Mr. Lange's work status as "disabled" (R. 25). The ALJ did "not view [the statements] as the doctor's

opinion, as it appears to be what [Mr. Lange] related to the doctor about his work status" (*Id.*). The ALJ noted that to the extent that it was Dr. Bush's opinion that Mr. Lange was disabled, her opinion "is not explained and not supported so therefore given little weight" (*Id.*).

The ALJ found further support for attributing to Mr. Lange a sedentary RFC because he "rarely reported that his pain was aggravated by sitting," and with the exception of standing twice for a few minutes each time, Mr. Lange was able to sit for the entire 1 hour and 15 minute hearing (R. 21-22). Furthermore, although Mr. Lange had been diagnosed with CTS, that condition was not the focus of his medical care, and he only occasionally showed clinical abnormalities (R. 21).

At Step 4, the ALJ found that Mr. Lange is unable to perform any of his past relevant work as a floor installer and contractor, as his "work activities [were] inconsistent with the residual functional capacity determined" (R. 25). But, at Step 5, the ALJ determined that Mr. Lange's age, education, work experience, and RFC allow him to perform jobs that exist in significant numbers in the national economy, specifically assembler, order clerk, and surveillance monitor (R. 25-26). Accordingly, the ALJ found that Mr. Lange was not disabled (R. 26).

### III.

The standards for review of the ALJ's decision are well-established. To receive DIB and SSI, a claimant must show that he has a disability, defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes any work existing in significant numbers in the national economy. *Id.* at § 423(d)(2)(A).

The Act provides a five-step sequential process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). The ALJ must consider whether: (1) the claimant has engaged in any "substantially gainful activity" since the alleged disability onset date; (2) his impairment or combination of impairments is severe; (3) his impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) his RFC prevents him from performing past relevant work; and (5) his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4); 404.1520(b)(f). The claimant bears the burden of proof at Steps 1 through 4, at which point the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

We will uphold an ALJ's decision if it is supported by "substantial evidence," defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotations omitted). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide an accurate and logical bridge between the evidence and her conclusion that a claimant is not disabled," *Kastner v. Astrue*, – F.3d –, 2012 WL 4799021, at *3 (7th Cir. Oct. 10, 2012), and "the ALJ may not ignore an entire line of evidence that is contrary to the ruling," *Terry*, 580 F.3d at 477.

**IV.**

Mr. Lange argues that the ALJ erred by: (1) stating that his only severe impairment is degenerative disk disease; (2) finding that the combination of his impairments do not meet or equal Listing 1.04; (3) finding Mr. Lange not fully credible; and (4) determining that he had the RFC to perform sedentary work (Pl.'s Mem. at 5-15). For the reasons that follow, we disagree and thus affirm the ALJ's decision.

**A.**

Mr. Lange first argues that the ALJ erred at Step 2 by determining that degenerative disk disease was his only severe impairment and improperly discounting his other impairments, including multiple other disorders of the spine, carpal tunnel syndrome, radiculopathy, and herniated and bulging disks (Pl.'s Mem. at 5-6).

At Step 2, the ALJ must determine whether the claimant has an impairment or combination of impairments that is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), such that it "significantly limits [one's] physical or mental ability to do basic work activities," *Id.* at § 404.1520(c). The Step 2 determination of severity "is merely a threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). So long as the ALJ considers the combined effect of all of Mr. Lange's impairments in the rest of the analysis, the ALJ's determination that other impairments were not severe does not, by itself, warrant remand. *Id.* at 926-27 (citing 20 C.F.R § 404.1523). Rather, we consider Mr. Lange's argument that the ALJ failed to consider the cumulative effect of Mr. Lange's alleged impairments in making her determinations at Steps 3 through 5.

**B.**

Mr. Lange next contends that the ALJ erred at Step 3 by determining that his impairments do not meet or medically equal Listings 1.04(A) or (C) (Pl.'s Mem. at 6-10). We address each Listing in turn.

**1.**

Mr. Lange argues that the record establishes the five medical findings required to meet Listing 1.04(A) (Pl.'s Mem. at 7-9). To meet Listing 1.04(A), a claimant must present evidence of a spine disorder that results in compromise of a nerve root or the spinal cord with "[e]vidence of

nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). To establish a disability under Step 3, the claimant must satisfy all of the criteria in the Listing. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

Mr. Lange selectively cites to portions of the medical record that he argues show that he has established the required pain, limited motion, motor loss, sensory and reflex loss, and positive straight leg raises to meet Listing 1.04(A) (Pl.'s Mem. at 7-9). Specifically, Mr. Lange contends that a form filled out by Dr. Ubilluz on June 27, 2007, for DDS, establishes that his impairments meet or equal Listing 1.04(A) (Pl.'s Mem. at 7). The form identifies that Mr. Lange has "radiculopathy, lower back pain, numbness in both legs, weak[ness] in [his] right leg, sensory changes, tenderness in [his] lower back" and that he "walks [in] an anatalgic fashion," "drag[ging] his right leg" (*Id.*). Mr. Lange also argues that the form establishes "evidence of nerve root compression" (*Id.*).

However, Dr. Ubilluz's report does not tell the whole story. Just as an ALJ may not "cherry-pick" the evidence by citing only that which supports her determination, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), neither may a plaintiff do so in challenging an ALJ's determination. In contrast to Mr. Lange, the ALJ's decision reviews the entire medical record, including Dr. Ubilluz's report for DDS, which found no atrophy or limitation of motion of the spine (R. 350). The ALJ did not find any medical reports in the record that showed that Mr. Lange met all of the Listing 1.04(A) requirements (R. 16). In addition, despite evidence that Mr. Lange suffers from pain and frequently has positive sitting straight leg raises, the ALJ determined that the record does not contain

21

evidence that Mr. Lange suffered from atrophy or significant muscle weakness, or sensory or reflex loss, and thus Mr. Lange does not meet all of the criteria of Listing 1.04(A) (*Id.*).

In making this determination, the ALJ offered more than a "superficial" analysis of the Listing. *See Brindisi v. Barnhart*, 315 F.3d 783, 786-87 (7th Cir. 2003). The ALJ discussed Mr. Lange's medical record in great detail, including each MRI study, the notes from many of the visits that Mr. Lange made to his doctors, and Mr. Lange's use of epidural steroid injections and medication to treat his pain (R. 18-21). In addition, despite Mr. Lange's argument to the contrary (Pl.'s Mem. at 7), the ALJ's written decision explicitly refers to Dr. Ubilluz's June 27, 2007 report and summarizes his findings (*see* R. 23). The ALJ gave a reasoned explanation, based on the evidence, for the conclusions she reached. We find that the ALJ's determination that Mr. Lange's impairments did not meet or equal Listing 1.04(A) was supported by substantial evidence.

**2.**

Mr. Lange also argues that the ALJ erred by finding that his impairments do not meet or equal Listing 1.04(C) (Pl.'s Mem. at 6-7). To meet Listing 1.04(C), a claimant must present evidence of "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.002(B)(2)(b)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C).

After a thorough review of the record, the ALJ found that no MRI study, physician's report, or examination has evidenced the existence of pseudoclaudication (R. 16). Though the ALJ noted that some MRIs revealed mild to moderate lumbar spinal stenosis (R. 21), this does not establish pseudoclaudication, as "pseudoclaudication is a symptom" of lumbar spinal stenosis. *See Sebree v.*

22

*Astrue*, No. 1:09-cv-1349-WTL-TAB, 2010 WL 3981855, at *4 n.1 (S.D. Ind. Oct. 8, 2010). While

pseudoclaudication cannot be viewed in an MRI, it can be diagnosed by a doctor, thereby "providing

objective evidence of the symptom" that has been reported by the claimant. *Id.* Unlike *Sebree*,

nowhere in Mr. Lange's extensive medical record is pseudoclaudication diagnosed. Thus, given the

lack of objective evidence, the ALJ's conclusion that Mr. Lange did not suffer from

pseudoclaudication is supported by substantial evidence.

Listing 1.04(C) also requires that a claimant's condition result "in inability to ambulate

effectively," which includes the need to use a hand-held assistive device. *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 1.00(B)(2)(b). While Mr. Lange testified at the ALJ hearing that he uses a cane

all of the time (R. 56), the ALJ did not find the cane to be medically necessary (R. 21). The ALJ

explained that within the medical record, Mr. Lange's "gait is more frequently described as normal,

than it is described antalgic" (*Id.*). Moreover, Dr. Ubilluz reported to DDS that Mr. Lange did not

need an assistive device for walking (*Id.*), and over the course of three years, Mr. Lange was only

observed using a cane during one medical visit (*Id.*). Furthermore, upon examination by DDS in

2007, Mr. Lange could walk fifty-feet without an assistive device and had a non-antalgic gait (R.

332).

In finding that Mr. Lange's impairments do not meet or equal Listing 1.04(C), the ALJ also

considered the opinions given by the two state agency medical consultants who reviewed the

evidence and concluded that Mr. Lange's impairments did not medically equal a Listing (R. 16). The

ALJ properly relied on these opinions. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)

(holding that the ALJ properly relied on the opinions of the state agency physicians as to whether

the claimant's impairment met or equaled a listing). As in *Scheck*, the ALJ did not reject any

evidence; rather, the ALJ found that the evidence did not support the position that the claimant met or equaled the listing. *Id.* at 701.

Because the record fails to reveal pseudoclaudication or the inability for Mr. Lange to ambulate effectively, we find that the ALJ's determination with respect to Listing 1.04(C) was supported by substantial evidence.

## C.

Mr. Lange contends that the ALJ improperly determined his credibility (Pl.'s Mem. at 10-15). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness this court will not overturn an ALJ's credibility determination unless it is patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotations and citations omitted). "When evaluating credibility, the ALJ must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at 311. The ALJ may not reject a claimant's testimony about the effects of his pain solely because his testimony is unsupported by the medical evidence. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

Mr. Lange argues that the ALJ improperly discounted his credibility because the ALJ stated that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible given a number of inconsistencies in the record" (R. 18). If that were the sum total of the ALJ's credibility determination, Mr.Lange's argument would have merit, as the Seventh Circuit has repeatedly criticized conclusory credibility determinations that use "boilerplate" language as "meaningless." *See, e.g., Parker*, 597 F.3d at 921-22. Here, however, the ALJ did not stop with that summary statement, but gave specific reasons why she rejected Mr. Lange's statements of limitations greater than those in the RFC. So long as the ALJ considers the

entire record and gives specific reasons for the weight given to the individual's statements, an ALJ's credibility determination may be supported by substantial evidence despite "a considerable amount of boilerplate language and recitations." *Shideler*, 688 F.3d at 312; *see also Sombright v. Astrue*, No. 10 C 2924, 2011 WL 1337103, at \*14 (N.D. Ill. Apr. 6, 2011) (holding that where the ALJ gave reasons why she rejected the claimant's statements of limitations greater than those in the RFC and made that determination in light of the administrative record as a whole, the ALJ's credibility determination was not patently wrong).

Here, the ALJ supported her credibility determination by providing specific examples of inconsistencies that she found to detract from Mr. Lange's credibility, including that Mr. Lange: (1) could not explain why his urine tests were inconsistent with his prescribed medications (and thus could not rebut the evident explanation that he was not taking medication as prescribed); (2) testified that he had significant side effects from his medications, when his doctors' progress reports consistently indicated otherwise; and (3) denied asking Dr. Ubilluz to change a letter written in support of his disability claim, when Dr. Ubilluz's notes state that Mr. Lange had requested the change (R. 22). In addition, in assessing Mr. Lange's credibility, the ALJ took into account her personal observations at the hearing (*Id.*). The ALJ noted that during the one hour and fifteen minute hearing, Mr. Lange only "stood twice for a few minutes each time," and despite alleging that his pain detracts from his concentration, he was able to "attend to the hearing and answered questions appropriately" (*Id.*).

Based on our review of the record, we find that the ALJ's credibility determination was thoroughly explained and was not patently wrong.

**D.**

Mr. Lange also argues that the ALJ improperly assessed his RFC (Pl.'s Mem. at 10-15). Specifically, Mr. Lange contends that the ALJ "play[ed] doctor," ignoring the objective medical evidence in the record and relying on her own medical opinions in determining that Mr. Lange was capable of performing sedentary work (*Id.* at 11). Mr. Lange argues that, in so doing, the ALJ gave too little weight to the opinions of Dr. Ubilluz and Dr. Bush, Mr. Lange's treating physicians (*Id.* at 14-15). In addition, Mr. Lange contends that the ALJ failed to consider the totality of his limitations in determining his RFC (*Id.* at 6, 15). We disagree.

A treating physician's opinion on the issues of the nature and severity of a claimant's impairments is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence in the record. *Allord v. Astrue*, 631 F.3d 411, 416-17 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). "If an ALJ does not afford controlling weight to such an opinion, he or she must articulate sufficient reasons for not doing so." *Id.* "[a]n ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal citations and quotations omitted).

However, "the ALJ is not required to give controlling weight to the ultimate conclusion of disability – a finding specifically reserved for the Commissioner." *Denton*, 596 F.3d at 424 (citing 20 C.F.R. § 404.1527(e)(1)). "[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

In this case, plaintiff argues that the ALJ should have given controlling weight to Dr. Bush's notes, specifically the portion which occasionally stated that Mr. Lange was "disabled," without any explanation (R. 25). The ALJ reasoned that to the extent that it was Dr. Bush's opinion that Mr. Lange was disabled, Dr. Bush's opinion "is not explained and not supported so therefore given little weight" (*Id.*). In addition, the ALJ did "not view [the statements] as the doctor's opinion, as it appears to be what [Mr. Lange] related to the doctor about his work status" (*Id.*). We find no error in that analysis.

Moreover, while Mr. Lange received pain treatment from Dr. Bush for years, Dr. Bush's opinions on the nature and severity of Mr. Lange's impairments were confined to his progress notes, which were primarily limited to Mr. Lange's description of his pain and Dr. Bush's observations upon his examinations. The ALJ considered these notes, and determined that they indicated that the epidural injections were "fairly effective," suggesting that they "provide sufficient relief that [Mr. Lange] could do sedentary work with a sit/stand option" (*Id.*). In addition, Dr. Bush's progress notes consistently documented no excessive side effects from Mr. Lange's medications (*Id.*). The ALJ's opinion was thus consistent with Dr. Bush's progress notes.

Mr. Lange fares no better in his attempt to rely on Dr. Ubittuz's reports. The ALJ explained that as was true with Dr. Bush, Dr. Ubilluz's two notes stating that Mr. Lange is "disabled to work" were "not very revealing in terms of specific, functional abilities and limitations" (R. 24). And, as we have explained, an ALJ is not required to give controlling weight to this ultimate conclusion. *See Denton*, 596 F.3d at 424. In addition, the ALJ reasoned that Dr. Ubilluz's second note refers to Mr. Lange's inability to do "physical work," which the ALJ found indicated "more strenuous and exertionally demanding" than sedentary work (R. 24-25). Furthermore, Dr. Ubilluz's second note,

written just a few weeks later at the request of Mr. Lange, suggests that "Dr. Ubilluz simply wrote what the claimant requested," thereby undermining the reliability of both notes (R. 24). *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007) (finding that form stating that claimant could not perform sedentary work was suspect because claimant's attorney apparently drafted it and it did not include any new medical evidence or any other basis to justify the more extreme limitations).

Besides the two notes described above, the ALJ reviewed Dr. Ubilluz's other notes in the record – which included Mr. Lange's complaints of pain and Dr. Ubilluz's notes from his examinations – and the opinion he wrote as to the nature and severity of Mr. Lange's impairments in the DDS questionnaire he filled out on June 27, 2007. As the ALJ noted, Dr. Ubilluz wrote that Mr. Lange could stand or walk for ten minutes, and needed to change positions every twenty to thirty minutes, but did not need an ambulatory device (R. 21, 23). As with Dr. Bush, the ALJ's assessed RFC was thus consistent with Dr. Ubilluz's recommendations (R. 21), and the ALJ adequately explained when she discounted Dr. Ubilluz's opinions.

Finally, in contrast to Mr. Lange's contentions, the ALJ's written decision shows that she considered the cumulative effect of Mr. Lange's alleged impairments, including his complaints of pain and CTS, in making her determination. The ALJ exhaustively reviewed Mr. Lange's testimony, diagnostic studies, MRI and EMG studies, and the results of his clinical examinations (*see* R. 18-21). The ALJ also reviewed the opinions of both state agency medical consultants as to Mr. Lange's RFC (that he could lift 20 pounds occasionally, 10 pounds frequently, stand/walk about six hours, sit about six hours, and perform all postural activities occasionally), but then concluded that greater limitations were necessary in the RFC based on the questionnaire filled out by Dr. Ubilluz and Mr. Lange's allegations of pain and minimal daily activities (R. 23).

We find that the ALJ provided "an accurate and logical bridge" between the evidence and her conclusion that Mr. Lange was not disabled. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). We find the ALJ's determination was supported by substantial evidence.

## CONCLUSION

Plaintiff's bottom line argument is that "if he has an impairment that causes pain, then he should be found disabled" (Pl.'s Reply at 1). However, an ALJ's disability determination requires a far more thorough analysis than suggested by plaintiff's syllogism. The ALJ here engaged in precisely that kind of thorough analysis, and articulated the steps in her analysis with a level of detail we rarely see and which is to be commended. For the reasons stated above, we find the ALJ's determination to be supported by substantial evidence. We therefore deny Mr. Lange's motion to remand (doc. # 20) and grant defendant's motion to affirm (doc. # 25). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 14, 2012